IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs February 1, 2005

## STATE OF TENNESSEE v. WILLIAM FERRIS

**Direct Appeal from the Criminal Court for Shelby County**
**Nos. 97-08278, 00-03945, 00-03946      Arthur T. Bennett, Judge**

_____

**No. W2003-01317-CCA-R3-CD  - Filed May 31, 2005**

_____

The defendant, William Ferris, was convicted by a Shelby County Criminal Court jury of two counts of especially aggravated kidnapping, a Class A felony; two counts of aggravated burglary, a Class C felony; and one count of aggravated robbery, a Class B felony.  The trial court sentenced him as a violent offender to twenty-five years for each of the especially aggravated kidnapping convictions and as a Range II, multiple offender to ten years for the aggravated burglary convictions and twenty years for the aggravated robbery conviction.  The court merged the two counts of especially aggravated kidnapping and the two counts of aggravated burglary and ordered that the kidnapping, burglary, and robbery sentences be served consecutively to each other for an effective sentence of twenty-five years in the Department of Correction.  The defendant raises essentially three issues on appeal: (1) whether the evidence is sufficient to sustain his convictions; (2) whether the trial court erred by not declaring a mistrial _sua sponte_ upon admission of testimony about the defendant's pending indictment for attempted second degree murder; and (3) whether the trial court erred in ordering consecutive sentencing.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, J., and JOE H. WALKER, III, SP.J., joined.

Gerald Stanley Green (on appeal) and Sam Perkins (at trial), Memphis, Tennessee, for the appellant, William Ferris.

Paul G. Summers, Attorney General and Reporter; Michael Markham, Assistant Attorney General; William L. Gibbons, District Attorney General; and Lee Coffee and David Pritchard, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The victim in this case, Melissa Bly-Ferris, was the defendant's estranged wife. According to the State's proof at trial, on February 10, 1997, the defendant, accompanied by two codefendants, Rickie Hopkins and Christopher Willis, forced his way into the victim's apartment, handcuffed her, took her jewelry and $113 in cash, and then transported her to Willis' home where she was confined for two days. On the third day, the defendant took the victim for a ride in his vehicle and she managed to escape. The defendant was subsequently charged in three separate indictments with two counts of especially aggravated kidnapping, two counts of aggravated burglary, and one count of aggravated robbery.

The State's first witness at the defendant's May 20-24, 2002, trial was Geoffrey D. Greene, who testified that, in February 1997, he and the victim were engaged to be married and had been living together in a Memphis apartment for approximately four months. On Monday, February 10, 1997, he departed for work at about 7:40 a.m., leaving the victim alone in the apartment. Noticing en route that the air in one of his vehicle's tires was low, he pulled into a service station and discovered that the tire had been slashed. As he was putting on the spare tire, a young man he later learned was Rickie Hopkins approached and repeatedly asked him for a ride, making him uncomfortable by his persistence. He, therefore, kept a cautious eye on Hopkins as he completed changing the tire.

After continuing to his workplace, Greene telephoned the victim at about 9:30 a.m. but failed to reach her. When he arrived home at lunchtime, he discovered the apartment door unlocked, the telephone off the hook, the victim's jewelry box missing, and the victim gone. After the police officer who responded to his call for assistance had taken his report and left, Greene drove to the defendant's home on Jessamine Cove but found no one at home. He then contacted the victim's family and friends and posted flyers with the victim's photograph in the neighborhoods around the victim's apartment and the defendant's home. On the third day of the victim's disappearance, acting in response to a tip generated by one of the flyers, he returned to the defendant's home in time to see the defendant departing in a jeep with the victim as his passenger. After some maneuvering, he managed to block the jeep with his vehicle and stop the defendant. At that point, the victim jumped from the jeep and ran over to his vehicle. She got inside and he immediately drove them to the police department. Greene acknowledged he never contacted the defendant to inform him the victim was missing. He said, however, that the victim had previously warned him to suspect the defendant if anything should ever happen to her.

After waiving his Fifth Amendment rights, twenty-six-year-old Rickie Hopkins, who was indicted with the defendant on the same charges, testified he had been incarcerated since May 1997, first in the Mississippi Department of Corrections on burglary and false pretenses convictions, and since January 2000 at the Shelby County Jail. In December 1996 he was living in the defendant's Memphis home with the defendant, with whom he had enjoyed a long-term friendship, and "Little John," the young son of the defendant and the victim. Hopkins testified he was hiding out from the police, having violated his Mississippi probation on his burglary and false pretenses convictions. He said the victim, who was also his friend, was not living with the defendant at the time and that the defendant was actively searching for her. The defendant took Hopkins to area strip clubs with

instructions to look for the victim and, without alerting her, report back to him if he should spot her working inside. Hopkins said he complied but never saw the victim at any of the clubs he checked.

Hopkins testified the victim had left the defendant on several previous occasions only to have the defendant force her to return to him. As an example, Hopkins related a 1994 incident in which the defendant instructed him to invite the victim to a party at his apartment. Hopkins testified that when the victim arrived with a boyfriend named Gary, the defendant and one of the defendant's sons, who were waiting in the darkened kitchen with shotguns, forced Gary on the floor at gunpoint, bound his arms with a coat hanger, and carried him outside to his vehicle. He said he and the defendant's son then drove Gary to his home while the defendant, the victim, and another woman followed in a separate car. Afterwards, the defendant and the two women, whom Hopkins described as "hysterical," "just left."

Hopkins testified that on February 9, 1997, the defendant and Christopher Willis left the defendant's house together at about 10:00 p.m. while he stayed behind to babysit Little John. When the men returned at 2:00 or 3:00 the next morning, Willis had a brown paper bag containing two pistols: a black, semi-automatic that looked like a 9 millimeter, which he gave to the defendant, and a chrome 357, which he put in his own pocket. The defendant instructed Hopkins to pack some clothing for Little John and told him that they were going to take the baby to a friend's before "going to go get [the victim]." According to Hopkins, the defendant had located the victim at least a week before and had learned the vehicle Greene was driving and Greene's work schedule.

Hopkins testified they arrived at the victim's apartment complex at about 5:00 a.m. after dropping Little John off with the defendant's friend. He said they waited in the defendant's parked jeep while the defendant formulated a plan for gaining entry into the apartment, discussing with Willis how they would slash Greene's tire, hide beside the building, and follow Greene back into the apartment after he discovered the flat. In accordance with that plan, Willis slashed the tire and Willis and the defendant took positions beside the building, leaving Hopkins in the vehicle with the engine running. However, when Greene came out, he drove off without seeing the flat. Therefore, the defendant and Willis returned to the jeep and the defendant began trailing Greene down the street. Soon, Greene pulled into a service station and the defendant stopped at a nearby shopping center. There, he handed Hopkins his pistol with instructions to pull it on Greene after obtaining a ride from him in his vehicle.

Failing in his attempts to get Greene to give him a ride, Hopkins returned to the jeep, where he, Willis, and the defendant watched as Greene changed his flat tire. They then followed Greene to his workplace before returning to the victim's apartment, where Hopkins gave the pistol back to the defendant, who slid it under his seat. The defendant and Willis then discussed having Willis force his way into the victim's apartment by posing as a process server, with the defendant and Hopkins to follow within a few minutes of his entry to the apartment. Accordingly, Willis left the jeep, and Hopkins and the defendant waited about four minutes before going to the apartment, where they found the door unlocked and Willis sitting inside beside the victim on a couch.

Hopkins testified that he did not see Willis' gun at that time and did not know if the defendant brought his pistol to the apartment. Nonetheless, he was positive that the victim, who was crying and obviously distraught, had not invited Willis into the apartment and did not want any of them to be there. He said the defendant ordered the victim to go into the bedroom with him, and he overheard her yelling to the defendant that he was not "worth shit" and she did not want to go with him. When the defendant called, Hopkins and Willis also went to the bedroom, where the victim was packing clothes in a suitcase. She finished packing and the defendant picked up her purse, told Willis to get her suitcase, and ordered Hopkins to get her jewelry box.

Hopkins testified that Willis, additionally, took some cash that was lying on a stereo in the apartment. He said the defendant stopped to handcuff the victim's wrists at the front door before throwing a coat over her arms and escorting her out to the jeep, where he made her lie down in the backseat and had Hopkins, who got in the back with her, cover her with a blanket. The defendant then drove around for about forty-five minutes before pulling into the garage at Willis' house and taking the victim out of the jeep and into a bedroom of the home where she remained for the next two days. During that time, the victim emerged from the bedroom only twice, each time accompanied by the defendant.

Hopkins was positive that the victim did not willingly accompany the defendant into the house and was not free to leave once inside. He said each of the home's three doors had a double deadbolt lock that could be opened from the inside only with a key. He claimed he did not have access to a key and was therefore himself unable to leave the house during the time the victim was kept hostage. He stated that the defendant also remained in the house during that time but that Willis went out each day to work as a taxi-cab driver. On the second day, Willis returned with one of the flyers with the victim's photograph, which he showed to the defendant. The defendant reacted by calling the flyer a joke and saying that Greene was wasting his time trying to find the victim. The next day, however, the defendant asked Hopkins where he wanted to be dropped off, telling him that he was going to take the victim to a cabin in Hardy, Arkansas, where Greene would not find her. Hopkins testified that the defendant and the victim took him to the Southland Mall between noon and 1:00 p.m. that day, and he did not see them again.

Hopkins denied he had been promised anything in exchange for his testimony but acknowledged he anticipated being allowed to plead guilty to the charges with his sentencing to be determined at a later time. He further acknowledged that the defendant never discussed robbing the victim and that Willis took the cash from the apartment on his own. He said that, to his knowledge, Willis did not share any of the cash with the defendant. He conceded he never saw the defendant holding a weapon on the victim.

On redirect examination, Hopkins agreed that the prosecutor had told him he would be tried separately and would be allowed to plead guilty only if the victim consented. He explained that his primary motivation for testifying was his desire to accept responsibility for his actions and to put the matter behind him. In support of that claim, he identified a 2001 letter he had written to the prosecutor in which he had offered to plead guilty and had stated that he wanted no part in causing

any further harm to the victim. In the letter, Hopkins reported having learned that the defendant had threatened that his brother and friends were going to prevent the victim from testifying at trial.

The twenty-four-year-old victim began her testimony by describing her relationship with the forty-eight-year-old defendant. She said she married the defendant when she was fifteen years old and pregnant with his child. The marriage was partly one of convenience, allowing her to become legally emancipated so that she could work as a stripper while still a minor. The defendant initially treated her well but after the birth of their child grew increasingly controlling, dictating her clothing, makeup, and actions, and accompanying her to her workplace and forcing her to give him the money she earned from dancing. Although she left him several times, he always eventually located her and forced her at gunpoint to return to him. She said the defendant also constantly threatened to kill her and was once arrested for choking her, but the charges were later dropped. She testified she had filed two divorce petitions against him: one soon after she turned eighteen, which was dismissed when she inadvertently missed a court date; and a second one that was still pending. The victim expressed her belief that the defendant had no intention of letting her go and said that he had engaged in a number of delaying tactics to prevent the divorce from being finalized.

The victim testified that at the time of the kidnapping she had filed for divorce and was fighting the defendant for custody of their son, who was at the time still living with the defendant. On February 10, 1997, she awoke to the sound of a knock at the door of the apartment she shared with Greene, followed by a man's voice stating that he was a process server for Melissa Ferris. Expecting it to be someone serving papers in connection with her pending divorce, she opened the door to find Willis, a taxi-cab driver she and the defendant knew from the club where she worked, standing at her door with a silver revolver in his hand. Although she screamed and attempted to shut the door, he forced his way inside and pushed her onto the couch, where he placed his knees on her stomach as he attempted to handcuff her. She told him she was pregnant, struggled, and slid to the floor. At about the time he managed to get the handcuffs on her, Hopkins walked in, followed a few minutes later by the defendant.

The victim testified that she did not see Hopkins with a gun. The defendant, however, opened up his trench coat to show her a black pistol he had in the side of his pants and told her he would shoot her if she continued to scream, tried to run, or caused any other problems. He then picked her up from where she was sitting handcuffed on the floor and took her to the bedroom, telling her that he wanted to make it appear as if she had left Greene. The victim said that the men ultimately removed some of her clothing, her backpack, her jewelry and jewelry box, and $113 in cash from the apartment. She remembered that the defendant picked up a bag of her clothing but could not remember who took her jewelry box from the apartment. She said she believed it was Hopkins who took the cash. At a later point in her testimony, however, she stated that the defendant appeared to be the one in charge and that he gave the other men orders throughout the entire episode.

The victim testified the defendant held his gun in her back as he walked her from the apartment to his jeep, threatening to shoot if she "act[ed] stupid." She described the blanket that covered her during the thirty-minute-to-an-hour drive from her apartment to Willis' home and the

bedroom in which the defendant placed her upon their arrival. She said there were no lights in the bedroom and the windows were covered in aluminum foil, but the first time the defendant left her alone she scratched a small hole in the foil. Through that small hole, she gained enough of a view of the street to allow her to later identify the location to the police.

The victim provided further descriptions of the conditions under which she was kept in the house, testifying that the defendant left the handcuffs on her wrists for the entire first day but on the second day placed them on her ankles instead. She said that for most of the time the defendant stayed in the bedroom with her, placing his gun on the dresser and alternating between threatening to kill her and talking about the wonderful things they were going to do together in the future. During that time, her son, who was brought to the house sometime after her arrival, was in and out of the bedroom. She ate nothing during her period of captivity because she refused the spaghetti the men offered her the first night and they never again offered her any food. She said the defendant reacted with anger when Willis showed him the missing flyer with her picture, screaming that it would now be a long time before they would be able to leave the house.

The victim testified she had no opportunity to escape because there were bars on the bedroom windows and one of the men was always in the living room. She therefore tried to convince the defendant that she still loved him and was willing to abort her baby for him, and she believed she was finally successful in that attempt after she had been held captive for about two days.[1] At that point, he placed the handcuffs back on her wrists, wrapped her in a blanket, and took her back through the house to the garage where he once again placed her in the backseat of the jeep with Hopkins while he got in the front seat with their son. Both he and Hopkins had a gun at the time but she did not see Willis. After driving for a while, the defendant pulled over and removed her blanket and handcuffs. She then got in the front seat with the defendant and their son got in the backseat with Hopkins.

The victim then said that after dropping Hopkins off at the Southland Mall, the defendant drove her and Little John to Mason, Tennessee, to look at a house with a basement, telling her that he needed a place to put her if she "misbehaved." He then took them to his home in Memphis where they gathered her bags, placed them in the jeep, and prepared to depart. Greene arrived as they were leaving and engaged the defendant in a type of "car tag" as he attempted to stop the jeep and the defendant attempted to get away. During this time, the defendant warned her not to get out of the jeep and threatened to kill her if she did so. However, when Greene finally succeeded in stopping the jeep, she took a chance and jumped from the jeep, leaving her son behind as she ran to Greene's vehicle and got inside. Before she could shut the car door, Greene sped away and drove immediately to the police department where she reported the kidnapping.

The victim stated that she was scared of the defendant during the kidnapping and remained extremely fearful of him at the time of trial. She explained that since her ordeal she had received a number of strange telephone calls and thought she had seen the defendant and others following her.

---

[1]The victim testified she was unsure of the exact length of time she was held in the bedroom.

She said she had been placed in a witness protection program and moved numerous times, but the defendant had been "spotted in quite a few places around where [she was] staying, quite a few times." The victim was adamant that she did not accompany the defendant anywhere of her own free will and had not consented to the removal of any of her property from her apartment.

On cross-examination, the victim testified that, since the kidnapping, the defendant had shot her roommate in the throat and consequently had a charge of attempted second degree murder pending against him. She acknowledged she told the police in her original statement that the defendant had carried, rather than walked, her from her apartment. However, she explained that and other inconsistencies between her statement and her trial testimony by the fact that the statement had been given immediately upon the conclusion of her ordeal, during which she had been locked in a bedroom for three days and two nights.

Force Roberts testified he was a former lieutenant of the Shelby County Sheriff's Department and had been assigned to search the defendant's jeep following the kidnapping. He said he found a woman's leather coat and a blanket matching the victim's descriptions inside the vehicle, but he had no way of determining how long the items had been there.

Eddie Scallions testified he was a detective with the Shelby County Sheriff's Department in 1997 and that he executed a search warrant on Willis' house in connection with his investigation of the kidnapping. Scallions identified photographs of a number of objects he found inside the residence, including a police scanner; a partial box of Winchester .38 caliber ammunition; a .357 Smith and Wesson revolver along with six live rounds of .38 caliber ammunition, which he said were capable of being fired from the gun; a Peerless handcuff box; an instruction manual for the handcuffs; and a handcuff key. In addition, he testified that the windows on the east side of the house, which faced the street, were covered with tin-foil and that one of the windows had a small tear in the foil.

Dr. Gerald Stipanuk, the medical director of the Shelby County Jail, testified that the defendant, who was in a wheelchair in the courtroom, suffered from arthritis in his right hip and had received a hip replacement on April 24, 2001. He said the defendant was capable of walking; the wheelchair had not been prescribed and the defendant's treatment plan called for him to exercise as much as possible. He stated that the defendant had frequently sought medical treatment during his incarceration. During the course of his treatment, the defendant had told Dr. Stipanuk that he had recently won a million-dollar lawsuit against the Shelby County Jail and that he was being represented by a team of four attorneys.

Attorney Michael Gatlin testified he represented the bonding company that had made a $50,000 bond on the defendant, which the defendant had forfeited on June 28, 1999, by his failure to appear at his original trial date. He said the company had hired several bounty hunters, including one who reported that he had located the defendant at a paramilitary encampment in Arkansas but was unwilling to retrieve him from that location. Gatlin testified he eventually filed a lawsuit against the defendant's sister, who had guaranteed the bond with a lien on her home and business, and she

arranged for the defendant to be returned to custody in exchange for the dismissal of the suit against her. According to Gatlin's records, the defendant was returned to custody "[o]n or about" February 22, 2000.

Against the advice of his counsel, the defendant testified in his own defense, explaining that he was a "pimp" and met the victim when, as a runaway, she "fell in with a couple of girls" who were "working" for him and began "hanging out" at his house. Asserting that he had never pretended to be "a good guy," he acknowledged he began a sexual relationship with the victim when he was in his late thirties and she was only fifteen. He insisted, however, that he was not guilty of any of the offenses for which he was on trial. Specifically, he denied that he ever kidnapped the victim, broke into her apartment, robbed her, or held her anywhere against her will.

The defendant testified he married the victim to enable her to become legally emancipated so that she could work as a topless dancer. He said the victim worked for him for about four years until she turned eighteen, at which time he terminated the relationship. He stated the victim left several times over the course of their relationship, including once when she abandoned their child alone in a house when the child was only six months old and sick with a fever. The defendant maintained that the victim was always free to come and go as she wished and that he never threatened or forced her to return to him. He denied he contested the divorce but said he had filed for an extension of time to respond to the second petition because of the number of false allegations contained in it, including the victim's claim that he had paid his friends to kidnap her and that he had shot her friend in the neck while attempting to kill her. The defendant also denied that he had ever belonged to a white supremacist paramilitary group and said that, to his knowledge, he had not been indicted on one count of murder in the second degree, as alleged in the petition.

The defendant testified that on February 10, 1997, Hopkins, who worked for him, was at the Memphis Inn with some of the "girls," while he was at home with Little John, several other "girls" and a few men. He said that at about 8:30 or 9:00 a.m., Willis, who also worked for him, came in, gave him about $3000 he had collected from some of the women who had worked the previous night, and informed him that the victim was at his house and wanted to see him. The defendant testified that Willis' house was a "flop house" and was used as a base from which the cabdrivers in his employ transported the women to area hotel rooms for their work.[2]

The defendant testified that when he and his son arrived at Willis' house, they found the victim sitting inside with several other women. After they had talked for a while, the victim voluntarily accompanied him and Little John first to the grocery store, where she remained in the jeep with the engine running while he and Little John shopped, and then back to the flop house where they spent the night. When asked if the victim was free to leave, the defendant replied:

---

[2]The defendant later explained that the aluminum foil covering the house's windows was used to block the sunlight so that the women, who worked at night, would be able to sleep during the daytime.

If she wanted to, she could have.  She could have called anybody.  [Willis] was in and out of the house.  There were two or three cars there at the house.  She could have went with anybody.  She could have gotten in the cab with [Willis] when he was going -- If she wanted to go out and turn a trick while he was there, she could have took off.  If she wanted to go to the store, she could have jumped in the car and took off.

He said that the next day he, the victim, and their son dropped Hopkins off at the Southland Mall before driving to a house the victim wanted him to see, which was located in either Mason or LaGrange.  He testified that they stopped to eat at a restaurant on their return trip and that he left the victim alone while he took their son to the restroom.  According to the defendant, there were several other patrons inside the restaurant and a highway patrol vehicle was parked outside when they arrived.  The victim, however, made no attempt to inform anyone that she was being held against her will.  He said they returned to Memphis after their meal, stopping at several different houses and area hotels for him to collect money from his women before going back to Willis' house.  Later, he took the victim to a strip club, returned home with his son, packed a few things, picked up some of his women, and then drove to Baltimore, where he remained for approximately two weeks.[3]

The defendant testified he never encountered Greene at his house while the victim was with him in his jeep and said that if he had, he would have "crushed his car up like a little tin can."  He said that Greene, Hopkins, and the victim were lying and Dr. Stipanuk had him confused with someone else.  He denied he was "hunting" for the victim on June 21, 1999, or that he shot anyone while in the process.  He explained his failure to appear in court for his original June 28, 1999, trial date as the result of the victim's having convinced "three or four individuals . . . that it would be in their best interest" to hold him "for ransom and to extort some pictures."  He said he was held in captivity for eight months, that he escaped only the day before he was returned to custody, and that he did not report the kidnapping to the police because his attorney advised him to say nothing about it until after the conclusion of his trial.  Finally, he acknowledged he had been convicted of kidnapping in 1985.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant's first three issues, as stated in his brief, essentially amount to a challenge to the sufficiency of the evidence in support of his convictions for aggravated burglary, especially aggravated kidnapping, and aggravated robbery.  When the sufficiency of the convicting evidence is challenged, the relevant question for this court to consider is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319, 99 S.

---

[3]The defendant claimed to run a broad-ranging prostitution business that serviced several other cities besides Memphis, including Baltimore and St. Louis.

-9-

Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

## A. Aggravated Burglary

To prove the defendant guilty of aggravated burglary, the State had to show beyond a reasonable doubt that he entered a habitation without the owner's consent and with the intent to commit a felony, theft, or assault. Tenn. Code Ann. §§ 39-14-402, -403 (2003). In this case, the defendant's two convictions for aggravated burglary, which were subsequently merged into a single judgment of conviction, were based on his unauthorized entry into the victim's apartment with the intent to commit a theft and with the intent to commit the felony offense of kidnapping. In his brief, the defendant states this first issue as whether the trial court abused its discretion by refusing "to grant the [defendant] probation on the charge of burglary [sic] in spite of the failure of the State to prove the entry into the residence of the [defendant's] wife was for the purpose of committing a felony." However, the short "argument" section on this issue consists solely of the defendant's assertion that his purpose in entering the victim's apartment, "shown even by the testimony of . . . the alleged victim" "was to remove [the victim] in order to convince her to come back to him." Thus, although far from clear, the defendant is apparently challenging whether the State adequately proved that he had the intent to kidnap the victim when he entered her apartment. The State responds by arguing, *inter alia*, that the proof was sufficient to show that the defendant entered the apartment with the intent both to kidnap the victim and to commit a theft. We agree with the State.

Viewed in the light most favorable to the State, there was overwhelming evidence that the defendant's intent in entering the apartment was to kidnap the victim. Through the testimony of Hopkins and the victim, the State established that the defendant, a controlling man who had in the past used force to make the victim return to him, searched for the victim for weeks, waited a week after locating her in order to familiarize himself with Greene's work schedule and vehicle, armed himself and Willis with weapons and a pair of handcuffs, brought Willis and Hopkins with him to the victim's apartment complex, and formulated several different plans for gaining entry into the apartment and access to the victim. This was more than sufficient proof to show that the defendant's "purpose" in entering the victim's apartment was to do more than "convince her to come back to him."

The evidence was also sufficient to show that the defendant entered the apartment with the intent to commit a theft. Theft occurs when a person, "with intent to deprive the owner of property, . . . knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103. The victim testified the defendant told her he wanted to make it appear as if she had left Greene, and she said that her jewelry and $113 were taken from the apartment in the process of the kidnapping. Although she could not remember who had carried her jewelry out and thought it was Hopkins who had taken the cash, she testified that the defendant appeared to be the person directing the enterprise. In addition, Hopkins' testimony, in which he described the defendant's issuing orders to him and Willis throughout the episode, including his instruction to Hopkins to take the victim's jewelry box, shows that the defendant exercised a leadership role in the offenses. From this evidence, the jury could have reasonably concluded that the defendant entered the apartment with the intent not only to kidnap the victim but also to take her property. We conclude, therefore, that the evidence was sufficient to sustain the defendant's convictions for aggravated burglary.

## B. Especially Aggravated Kidnapping

The defendant next contends that the evidence was insufficient to sustain a conviction for "aggravated kidnapping [sic]" because "the false imprisonment was not committed to facilitate the commission of any felony or flight thereafter." However, the defendant was convicted not of aggravated kidnapping but of especially aggravated kidnapping, which, for the purposes of this case, occurs when a person "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty" and such act is "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." Tenn. Code Ann. §§ 39-13-302(a), -305(a)(1). Viewed in the light most favorable to the State, the evidence was more than sufficient to support the defendant's convictions for especially aggravated kidnapping. The victim testified that Willis used a silver gun as he forced his way into her apartment and that the defendant threatened her with a black gun when he followed Hopkins into the apartment a few moments later. She also said the defendant held the gun in her back as he removed her from the apartment, laid it on the dresser as he talked to her in the bedroom at Willis' house, and had it with him when he eventually brought her out of the house. Although Hopkins acknowledged he never saw the defendant holding a weapon on the victim, he testified that Willis

and the defendant armed themselves with a chrome pistol and a black pistol, respectively, before setting out to kidnap the victim. The State, therefore, presented more than enough proof for a rational trier of fact to find the defendant guilty of especially aggravated kidnapping beyond a reasonable doubt.

### C. Aggravated Robbery

The defendant was also convicted of one count of aggravated robbery. Aggravated robbery is defined, *inter alia*, as the intentional or knowing theft of property from the person of another by violence or putting the person in fear and which is accomplished with a deadly weapon. Tenn. Code Ann. §§ 39-13-401(a), -402(a)(1). As previously stated, a person commits theft of property by knowingly obtaining or exercising control over another's property without the owner's effective consent and with the intent to deprive the owner of the property. Tenn. Code Ann. § 39-14-103. Although his argument on this issue is again far from clear, the defendant appears to challenge the sufficiency of the evidence in support of his aggravated robbery conviction by asserting that the facts do not show he intended to deprive the victim of her property. We respectfully disagree. Viewed in the light most favorable to the State, the evidence established that the defendant and the codefendants took the victim's jewelry and cash after the defendant showed her his gun and threatened to shoot her if she caused him any problems. Absolutely no proof was presented of the defendant's having returned the jewelry or cash to the victim or of having expressed any intention of doing so. We conclude, therefore, that the evidence was sufficient to sustain the defendant's conviction for aggravated robbery.

### II. Trial Court's Failure to Declare a Mistrial *Sua Sponte*

The defendant next contends that the trial court erred by failing to declare a mistrial *sua sponte* when testimony about his pending indictment for second degree murder was elicited from a witness. The State argues the defendant has waived the issue by his failure to cite to the record, provide a supporting argument, raise a contemporaneous objection at trial, or raise the issue in his motion for a new trial. We agree with the State.

The record reflects that the first mention of the defendant's pending attempted second degree murder indictment was made by defense counsel as he cross-examined the victim about alleged inaccuracies in her divorce petition; specifically, the fact that the petition alleged the defendant had been indicted for second degree murder rather than attempted second degree murder. However, "[e]vidence, even if inadmissible, cannot be the basis for error if elicited by the complaining party." State v. Williams, 851 S.W.2d 828, 833 (Tenn. Crim. App. 1992) (citations omitted). Furthermore, as the State points out, the defendant failed to raise any objection to the State's earlier motion to admit the divorce petition into evidence at trial, to raise the issue in his motion for a new trial, or to cite to the record or provide an argument in support of the issue in his appellate brief. We, therefore, agree with the State that the defendant has waived consideration of this issue on appeal. See Tenn. R. App. P. 3(e) (providing that "no issue . . . shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel,

or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial"); Tenn. R. App. P. 27(a)(7) (providing that the appellate brief "shall contain" an argument with citations to the authorities and appropriate references to the record); Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

Even if not waived, the defendant would not be entitled to relief on this issue. Whether to declare a mistrial lies within the sound discretion of the trial court, and its decision in this regard will not be overturned on appeal absent a showing of an abuse of discretion. State v. Land, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000). A mistrial should be declared in a criminal case only when something has occurred that would prevent an impartial verdict, thereby resulting in a miscarriage of justice if a mistrial is not declared. See id. (citing State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994)); State v. Jones, 15 S.W.2d 880, 893 (Tenn. Crim. App. 1999) (citing Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977)). "Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991) (quoting Arnold, 563 S.W.2d at 794). No such manifest necessity existed in this case. From our review of the record, defense counsel's deliberate elicitation of testimony about the defendant's pending indictment appears to have been part of his overall defense strategy of casting doubt upon the credibility of the victim by pointing out inaccuracies in the divorce petition and inconsistencies between her trial testimony and prior statement to police. This issue, therefore, is without merit.

### III. Consecutive Sentencing

As his final issue, the defendant contends that the trial court erred in imposing consecutive sentencing. The burden is on the defendant, as the party challenging the sentences, to show that the sentences imposed by the trial court are erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." Ashby, 823 S.W.2d at 169.

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation

or treatment. Tenn. Code Ann. §§ 40-35-103, -210 (2003); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

Tennessee Code Annotated section 40-35-115(b) provides that it is within the trial court's discretion to impose consecutive sentencing if it finds by a preponderance of the evidence that any one of the following criteria applies:

(1)     The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;

(2)     The defendant is an offender whose record of criminal activity is extensive;

(3)     The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4)     The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5)     The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6)     The defendant is sentenced for an offense committed while on probation; or

(7)     The defendant is sentenced for criminal contempt.

These criteria are stated in the alternative; therefore, only one need exist to support the imposition of consecutive sentencing.

Although the defendant's presentence report is included in the record, the transcript of the sentencing hearing is not. In the absence of a full and adequate record, we must ordinarily presume that the trial court's ruling was correct. See State v. Ivy, 868 S.W.2d 724, 728 (Tenn. Crim. App. 1993). However, in the transcript of the hearing on the motion for a new trial, which is included in the record, the trial court stated that it had ordered consecutive sentences based on its findings that the defendant, by his own admission, was a professional criminal who had knowingly devoted himself to criminal acts as a major source of his livelihood; that the defendant was an offender with a record of extensive criminal activity, as evidenced by his "horrible history" contained in the presentence report; and that the defendant was a dangerous offender whose behavior indicated little

-14-

or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. We conclude that the record in this case fully supports these findings. Accordingly, we affirm the trial court's imposition of consecutive sentencing.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE